FILED
May 05, 2020
10:45 AM(ET)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | | |
|---|---|---|
| **Lindsey Smith,** | ) | **Docket No.: 2018-01-0762** |
| **Employee,** | ) | |
| **v.** | ) | |
| **Dialysis Clinic, Inc.,** | ) | **State File No.: 59714-2018** |
| **Employer,** | ) | |
| **And** | ) | |
| **The Hartford,** | ) | **Judge Audrey A. Headrick** |
| **Carrier.** | ) | |

---

## EXPEDITED HEARING ORDER
### *(DECISION ON THE RECORD)*

---

This case came before the Court on Ms. Smith's Request for an Expedited Hearing on the record. She asked the Court to order Dialysis Clinic to authorize medical treatment, including various medical apparatus, allegedly stemming from a low-back injury. Because the authorized treating physician offered conflicting and speculative opinions regarding the work-relatedness of her current condition, the Court denies Ms. Smith's request.

### History of Claim

The medical chronology from Ms. Smith's August 4, 2018 accident is complex. A summary is below.

Ms. Smith injured her neck and right shoulder while transferring a patient. After a shoulder MRI, Dr. Peter Lund, a panel-selected physician, determined that she did not need shoulder treatment but recommended a neck evaluation. On November 30, panel-selected physician Dr. Alex Sielatycki performed neck surgery.

Afterward, Ms. Smith reported balance and stroke-like symptoms when turning her head. As a result, Dr. Sielatycki ordered a wheelchair and referred her to multiple

specialists over the next two years based on his diagnosis of possible vertebral artery syndrome that "may have been related to retractor placement and the [neck] surgery."

In the meantime, Ms. Smith sought emergency treatment at a local hospital complaining of almost fainting, weakness, dizziness, "seeing stars," difficulty swallowing, lip numbness, and tingling in her arms. She underwent diagnostic testing, including a brain CT, CTA chest, chest x-ray, and 24-hour Holter monitoring, which were all normal.

Ms. Smith saw Dr. David Hauge, a panel-selected neurosurgeon, soon afterward. Dr. Hauge concluded that no complications from the surgery were causing Ms. Smith's symptoms. He recommended a cardiology consultation with additional Holter monitoring.

A month later, Ms. Smith sought unauthorized neurological treatment. Her evaluation resulted in normal test results from an ophthalmoscope exam of her eye, a lumbar puncture, and brain CT. The doctor diagnosed "[p]ossibility of conversion disorder, complex migraine, or malingering" and did not recommend any further testing.

Ms. Smith sought emergency treatment one week later complaining of weakness and inability to walk. She declined the provider's recommendation of physical therapy and a neuropsychiatric evaluation.

Two weeks later, Ms. Smith underwent an authorized evaluation by cardiologist Dr. Kinsman Wright. Dr. Wright suggested that Ms. Smith see vascular surgeon, Dr. Chris Lazar.

Ms. Smith then sought unauthorized treatment from three specialists at Mayo Clinic. A neurologist found "no objective findings during her reported sensory symptoms, perception of left facial drooping and perceived altered sensorium." The neurologist suspected "deliberate efforts not to move her neck." A neurosurgeon concluded it was "not entirely clear . . . what is causing Ms. Smith's symptoms." After obtaining normal diagnostic studies, another neurosurgeon evaluated Ms. Smith and concluded he saw "absolutely nothing to explain her spells." The neurosurgeon suggested that Ms. Smith consult with a psychologist or psychiatrist for possible conversion disorder.

Three months later, Ms. Smith received an authorized evaluation by vascular surgeon Dr. Sachin Phade. Dr. Phade was unable to review her Mayo Clinic records and recommended that Ms. Smith see a neurologist. He stated that if her Mayo Clinic records were normal, "it is highly unlikely that this is a vascular issue." Further, Dr. Phade wrote that even if Ms. Smith had a compromised vertebral artery, "it would seem odd that this would cause her symptoms."

Ms. Smith had an authorized second-opinion evaluation with orthopedic surgeon Dr. Richard Pearce two months later. He found no vascular impingements and nothing to warrant additional neck surgery. However, Dr. Pearce recommended she see a vascular surgeon.

Ms. Smith then underwent an authorized evaluation with neurologist, Dr. Larry Gibson. He concluded that he had nothing to offer and felt her symptoms suggested vertebrobasilar insufficiency. Dr. Gibson referred Ms. Smith for a neuro-interventionalist.

Throughout Ms. Smith's appointments with various specialists and unauthorized treatment at various hospitals, she continued to see Dr. Sielatycki. At a follow-up appointment, he noted that "[possible vertebral artery syndrome] is something that is in correlation with the operation she had, not necessarily directly caused by it, but the fact that the symptoms have come about afterwards is what led to the need for this treatment." Dr. Sielatycki referred Ms. Smith to vascular surgeon Dr. Larry Sprouse.

Ms. Smith returned to Dr. Sielatycki's office in February 2020 and saw PA Melissa Shuleva for low-back pain. Ms. Smith reported that she was getting into a wheelchair a week earlier when she began experiencing pain. PA Shuleva's record reflects she discussed Ms. Smith's symptoms with Dr. Sielatycki, who stated he did "not see that lower back pain is related to original work-related injury." However, in a later addendum, Dr. Sielatycki stated he did "not believe it can be firmly stated that the low back is not related to her original work injury," since her pain occurred when she transferred to the wheelchair. Further, Dr. Sielatycki ordered a lumbar spine MRI, shower chair, and electric wheelchair.

In March, Ms. Smith saw Dr. Sprouse, who concluded her symptoms were not vascular in nature. He referred her to an ophthalmologist for complaints of left-eye pressure and to neurosurgeon Dr. Paul Hoffman to determine if her complaints were neurological. Dr. Sprouse concluded he was "unclear at this point of the etiology [of Ms. Smith's symptoms]."

Turning to the testimony, Dr. Sielatycki testified by an undated affidavit regarding causation and his recommendation of additional medical treatment for Ms. Smith's balance and stroke-like symptoms.[1] Dr. Sielatycki stated Ms. Smith's "diagnosis is still

---

[1] Dialysis Clinic objected to the admissibility of Dr. Sielatycki's affidavit under Rules 702 and 703 of the Tennessee Rules of Civil Procedure. It cited various portions of Dr. Sielatycki's testimony and medical records to show that his opinions lacked trustworthiness. However, Dialysis Clinic did not identify a fault with his methodology, processes or data; it merely disagreed with his conclusions. When determining the admissibility of expert opinions under rules 702 and 703, courts should consider whether "the opinions are based on relevant scientific methods, processes, and data." *McDaniel v. CSX Transp.,* 955 S.W.2d

being investigated by a vascular surgeon and may represent vertebral artery syndrome." Due to Ms. Smith's post-surgery symptoms, Dr. Sielatycki ordered a wheelchair. He noted that Ms. Smith reported she injured her low back a year later when transferring from her wheelchair. Dr. Sielatycki provided an opinion that "the low back injury . . . is directly connected to her workers' compensation injury and is a part of her injury claim flowing from her initial workers' compensation injury and . . . arose primarily (over 51%) as a result of her work-related injury."

Ms. Smith testified by affidavit regarding her medical condition.[2] She believes that the neck surgery caused her balance and stroke-like symptoms. Ms. Smith requested medical treatment for her back, right-shoulder, balance and stroke-like symptoms, and payment of her unauthorized medical expenses.

### Findings of Fact and Conclusions of Law
*Standard Applied*

Ms. Smith must present sufficient evidence demonstrating she is likely to prevail at a hearing on the merits. *See* Tenn. Code Ann. § 50-6-239(d)(1) (2019). The Court holds she did not satisfy this burden.

### Analysis
*Medical Benefits*

To receive medical benefits, Ms. Smith must show, to a reasonable degree of medical certainty, that the August 4, 2018 incident "contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14). When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment. *Lee v. W. Plastics*, 2016 TN Wrk. Comp. App. Bd. LEXIS 53, at *6-7 (Oct. 20, 2016). Further, the opinion of the treating physician selected from a panel is afforded a presumption of correctness on causation although that presumption can be overcome by a preponderance of the evidence. *Id.* at § 50-6-102(14)(E).

Here, Dr. Sielatycki's opinions are based on his diagnosis of possible vertebral artery syndrome stemming from Ms. Smith's neck surgery. However, he provided contradictory causation opinions. Initially, Dr. Sielatycki noted that her possible diagnosis "is something that is in correlation with the operation she had, not necessarily directly caused by it, but the fact that the symptoms have come about afterwards is what

---

257, 265 (Tenn. 1997). The Court overrules the objection and holds the issues raised by Dialysis Clinic go to the weight given to Dr. Sielatycki's opinions rather than admissibility.

[2] The Court sustains Dialysis Clinic's objections regarding hearsay and medical/legal conclusions drawn by Ms. Smith.

led to the need for this treatment." A later note reflected that he did "not see that lower back pain is related to original work- related injury," but in an addendum indicated he did "not believe it can be firmly stated that the low back is not related to her original work injury." In Dr. Sielatycki's affidavit, he testified that "the low back injury . . . is directly connected to her workers' compensation injury and is a part of her injury claim flowing from her initial workers' compensation injury and . . . arose primarily (over 51%) as a result of her work-related injury." Due to Dr. Sielatycki's inconsistent statements, the Court gives little weight to his causation opinions.

The Workers' Compensation Law provides that a compensable injury is one that "in the opinion of the physician, is more likely than not considering all causes, as opposed to speculation or possibility." Tenn. Code Ann. § 50-6-102(14)(D). Dr. Sielatycki's opinions appear speculative. Likewise, it is not clear that Dr. Sielatycki considered all causes. Providers from whom Ms. Smith sought unauthorized treatment recommended a psychiatric evaluation for possible conversion disorder and felt there was no need for further testing or treatment. Authorized providers found no cause for Ms. Smith's symptoms. Importantly, Dr. Sielatycki's testimony indicates he was unaware of Dr. Sprouse's determination that Ms. Smith's symptoms are not vascular in nature since he stated her "diagnosis is still being investigated by a vascular surgeon and may represent vertebral artery syndrome."

After considering Ms. Smith's medical records and Dr. Sielatycki's conflicting opinions, the Court holds that the preponderance of the evidence rebuts the presumption of correctness afforded to Dr. Sielatycki's opinion. Further, the Court finds the proof presented is insufficient to establish a causal connection between the medical treatment and apparatus ordered and Ms. Smith's work injury.

The Court next considers Dr. Sprouse's recent referrals to a neurosurgeon and an ophthalmologist. As previously noted, Ms. Smith's proof is insufficient to establish a causal connection between the medical treatment and her work injury. It appears that Dr. Sprouse was unaware that Ms. Smith already saw a neurosurgeon, Dr. Hauge, who found no complications from the neck surgery causing Ms. Smith's symptoms. Likewise, Ms. Smith previously had normal test results from an ophthalmoscope exam of her eye. The Court concludes that the referrals are not medically appropriate.

Regarding Ms. Smith's request for shoulder treatment, Tennessee Code Annotated section 50-6-204(a)(1)(A) obligates an employer to provide medical treatment "made reasonably necessary." Dr. Lund performed an MRI and shoulder evaluation and concluded that she did not need treatment. Therefore, the requested treatment is not made reasonably necessary by the work injury.

Finally, regarding Ms. Smith's request for payment of her unauthorized medical treatment, the medical records do not indicate that Ms. Smith's work injury contributed more than fifty percent in causing the need for treatment.

Therefore, the Court holds Ms. Smith is not likely to prevail at a hearing on the merits in proving entitlement to the requested medical benefits.

**IT IS, THEREFORE, ORDERED** as follows:

1.  The Court denies Ms. Smith's requested relief.

2.  This case is set for a Status Hearing on **Tuesday, June 30, 2020, at 2:00 p.m. Eastern Time**.  The parties must call (423) 634-0164 or toll-free at (855) 383-0001 to participate.  Failure to call might result in a determination of the issues without the party's participation.

**ENTERED May 5, 2020.**


_Audrey Headrick_____
**JUDGE AUDREY A. HEADRICK**
**Court of Workers' Compensation Claims**

6

**APPENDIX**

Exhibits:
1. Affidavit of Ms. Smith
2. Medical records:
    a. Dr. Sielatycki
    b. Dr. Larry Sprouse (March 9, 2020)
    c. Dr. Peter Lund (September 21, 2018)
    d. Dr. Richard Pearce (August 29, 2019)
    e. Erlanger (March 22, 2019)
    f. AFC Urgent Care/Alliance PT
    g. Dr. Sachin Phade (June 4, 2019)
    h. CHI Memorial (February 8, 2019)
    i. Dr. David Hauge (February 13, 2018)
    j. Dr. Jeffery Clinkscales (March 28, 2019)
    k. Dr. Kinsman Wright (April 9, 2019)
    l. Mayo Clinic:
        i. Dr. Irene Meissnes (May 14, 2019; May 17, 2019)
        ii. Dr. Christopher Wood (May 14, 2019)
        iii. Dr. Benjamin Elder (May 16, 2019)
        iv. Dr. Frederick Meyer (May 22, 2019)
    m. Dr. Larry Gibson (August 30, 2019)
3. Affidavit of Dr. Sielatycki
4. Declaration of LeAnn Negron
5. Medical bills:
    a. CHI Memorial
    b. Tennessee River Physicians, PLLC
    c. Chattanooga Emergency Med., PLLC
    d. Erlanger Medical Center

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Notice of Substitution of Counsel
4. Request for Expedited Hearing
5. Employer's Response to Employee's Request for Expedited Hearing
6. Employee's Response to Employer's Response to Employee's Request for Expedited Hearing
7. Employer's Motion to Dismiss Employee's Request for Expedited Hearing
8. Employee's Motion to Amend
9. Employer's Response to Employee's Motion to Amend

10. Order Granting Employee's Motion to Amend and Denying Motion to Dismiss Employee's Request for Expedited Hearing
11. Docketing Notice
12. Position Statement
13. Brief in Support of Position Statement
14. Objections to Admissibility
15. Additional Exhibits to Decision on the Record

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on May 5, 2020.

| Name | Certified Mail | Email | Service sent to: |
|------|---------------|-------|------------------|
| Michael A. Wagner, Employee's Attorney | | X | maw@wagnerinjury.com |
| Dana Pemberton, Employer's Attorney | | X | dana@stokeswilliams.com |

_____/s/ Penny Shrum_____ w/permission JD
**PENNY SHRUM, COURT CLERK**
**wc.courtclerk@tn.gov**